**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| WILLIAM and PATRICIA CAVALLARO, <br><br> Petitioners, <br><br> vs. <br><br> UNITED STATES OF AMERICA <br><br> Respondent. | No. 99-CV-12625-PBS |

**MEMORANDUM AND ORDER**

July 27, 2001

Saris, U.S.D.J.

## I. INTRODUCTION

This action involves an Internal Revenue Service ("IRS") proceeding to determine the correct tax liability of petitioners William and Patricia Cavallaro ("the Cavallaros") for the years 1987 through 1996. The IRS has issued a third-party recordkeeper summons to the accounting firm of Ernst & Young seeking documents the accounting firm created or received while working on estate tax and corporate merger issues with petitioners' attorney at the law firm of Hale and Dorr.

The Cavallaros have filed a motion to quash the IRS summons on the grounds that these documents are protected by the attorney-client privilege. The United States has filed a counterclaim seeking enforcement of the summons, arguing that the

29

accounting firm's communications are not privileged.

For reasons stated below, the petition to quash is **DENIED** and the government's counterclaim to enforce the summons is **ALLOWED**.

## II. BACKGROUND

The following facts are treated as undisputed, except where otherwise noted.

### A.   The Dawn of Camelot

William and Patricia Cavallaro ("the Cavallaros") founded Knight Tool, Inc. ("Knight") in 1976 to manufacture tools for companies such as McDonnell Douglas, Polaroid, and Raytheon.  In 1983, William Cavallaro and his son Kenneth developed a rudimentary glue-dispensing machine.  The business met with little commercial success for several years as a result of difficulties in marketing the machines.  In order to give the Cavallaros' three sons an opportunity to pursue and promote this glue-dispensing machine business, the Cavallaros formed Camelot Systems, Inc. ("Camelot") in 1987.  The sons were named as sole shareholders.  Thereafter, Knight, owned by Mr. and Mrs. Cavallaro, continued to manufacture the machines.  Camelot, owned by the sons, became the sole distributor.  Both Knight and Camelot employees received their salaries from Knight.

The three sons worked hard to build Camelot through aggressive product marketing, a complete re-engineering of the

-2-

original glue-dispensing machine, and the development of five new models, all produced by Knight.  As a result, Camelot became financially successful over the next several years.  On December 31, 1995, Knight merged into Camelot.  On July 1, 1996, Camelot was sold for approximately $97 million.

**B.   Involvement of Ernst & Young and Hale and Dorr**

In 1992, when Camelot was beginning to enjoy increasing commercial success, the Cavallaros, on behalf of Knight, contacted the law firm of Hale and Dorr to discuss engaging the firm.  In October of 1994, the Cavallaros again contacted Hale and Dorr to assist with their estate planning, which included potential transfer tax issues arising from the close business relationship between Knight and Camelot.  Between December 19, 1994 and December 31, 1995, Hale and Dorr provided legal advice to Knight and the Cavallaros, acting on behalf of Knight, with respect to the merger of Knight into Camelot.  During those meetings, Hale and Dorr advised the Cavallaros on drafting certain affidavits purporting to establish the respective values of each company.

Camelot had first begun to meet with Ernst & Young in June of 1994 for tax planning meetings.  Ernst & Young sent Camelot a letter of engagement on November 16, 1994 documenting this business relationship and the work that would be accomplished. More specifically, the engagement letter states that Ernst &

Young had been hired by Camelot to provide tax advice "solely for the benefit of Camelot Systems, Inc. and not for the benefit of anyone other than the corporation and its shareholders." (IRS Exhibit J.)

On December 15, 1994, Ernst & Young sent William Cavallaro a letter not only recommending the merger of Knight and Camelot in preparation for the future sale of the company, but also offering options to minimize future gift transfer taxes.

Ernst & Young explained that the IRS would closely examine the respective values of Knight and Camelot at the time of the merger to determine the proper allocation of the sales proceeds between the two corporations' shareholders. The Ernst & Young letter went on to warn petitioners that, because Camelot had no employees and virtually no tangible assets, and because Knight bore most of the expenses and risks of the glue-dispensing business, the IRS would likely value Knight at approximately 85% of the newly merged corporation, and Camelot at 15%. Because such a valuation would defeat the tax saving goal of allocating most of the sale proceeds to the Cavallaro children, Ernst & Young made several recommendations as to how Knight could transfer assets to Camelot after the merger, but before any future sale of the company. In particular, the accounting firm advised the Cavallaro parents that significant savings on tax liability would be possible if, following a merger, they

-4-

commenced a gifting program to their children in order shift the
respective ownership interests in the merged company from the
parents to the children.

On December 19, 1994, the Cavallaro parents, their three
sons, the Camelot comptroller, accountants from Ernst & Young,
and lawyers from Hale and Dorr attended a meeting.  Neither
Camelot nor the three sons had an attorney.  Hale and Dorr was
representing only the parents.  This meeting is the Rubicon of
this litigation because the petitioners claim it triggered the
protection of the attorney-client privilege by altering the
nature of their relationship with Ernst & Young.

## C.  Allegation of Fraud

The Cavallaros did not follow the recommendations outlined
in the December 15, 1994 Ernst & Young letter.  Instead, on May
23, 1995, William Cavallaro and his oldest son, Kenneth, signed
affidavits that were directly at odds with the accounting firm's
initial valuation.  In these affidavits, William and Kenneth
Cavallaro stated that, when Camelot was formed in 1987, Knight
had gifted the glue-dispensing machine technology to Camelot.
William Cavallaro justified this gift transfer on the basis that
the technology had not been profitable up to that time and, he
believed, was "no more than a promising raw idea."  Ernst &
Young's subsequent December 31, 1995 valuation, at the time of

the merger, reflected this alleged (but undocumented) technology
transfer.

The result of the undocumented transfer was significant to
the valuation of the companies.  While the technology purportedly
had no value in 1987, by the time of the merger in 1995,
Camelot's value with the technology represented an 85% stake of
the newly formed company, making Knight's value a 15% stake.
This valuation, assuming an earlier undocumented technology
transfer as described in the affidavits, directly contradicted
Ernst & Young's valuation made just five months earlier which
valued Camelot at 15% and Knight at 85% of the newly formed
company.  As a result of these new valuations, and thus the new
value to the Cavallaros and their sons as shareholders, the
transfer tax liability was substantially reduced.[1]

Suspicious of both this contradiction in valuations and the
reduction of the transfer tax liability, the IRS began a tax
fraud investigation into whether the Cavallaros had attempted to
manufacture a prior pattern of gifting to their children, through
the use of the technology transfer, to avoid transfer taxes.  Out
of this investigation the United States issued the third-party

---

[1] As the IRS agent explained: "The summonsed information is
important to my examination because if Knight was undervalued and
Camelot overvalued at the time of the merger, William and
Patricia Cavallaro would have effectively made a disguised gift
to their sons in the form of post-merger Camelot stock (formerly
owned by them as Knight stock)."  (Decl. of B. Tonneson at ¶17.)

summons to Ernst & Young.  The merged company eventually sold for $97 million.

## D.  Documents in Question

The IRS issued the third-party summons on December 7, 1999, requesting twenty-eight documents created between the December 19, 1994 meeting and the December 31, 1995 merger of Knight into Camelot.  The Cavallaros filed suit on the same day the summons issued, seeking to quash the summons on privilege grounds.  The Cavallaros claim that during this period Hale and Dorr consulted with Ernst & Young concerning transfer tax and merger issues. The Cavallaros insist that, because Ernst & Young aided Hale and Dorr in giving legal advice to Knight and the Cavallaros, these documents are privileged.

The accountant communications in question include: (1) notes from the December 19, 1994 meeting addressing transfer tax issues; (2) follow-up communications arising from the Dec. 19th meeting; and (3) subsequent communications addressing the merger of the two companies.

The Court heard arguments on the matter on September 19, 2000.  At argument the Court authorized the IRS to depose an employee of Ernst & Young pursuant to Fed. R. Civ. P. 30(b)(6). Thereafter, the deposition of Lawrence Goodman, a senior manager of the Tax Department of Ernst & Young, took place and the parties submitted additional briefing.

### III. DISCUSSION

**A.  The Standard**

The party invoking a recognized privilege has the burden of establishing, not only the existence of that privilege, but also that the established privilege was not waived. See United States v. Wilson, 798 F.2d 509, 512-13 (1st Cir. 1986). The existence of a privilege is a factual determination for the court under Fed. R. Evid. 104(a). See id. at 512.

It is well established that no accountant-client privilege existed at common law. See United States v. Arthur Young & Co., 465 U.S. 805, 817 (1984); United States v. Mullen & Co., 776 F. Supp. 620, 621 (D. Mass. 1991). In addition, prior to 1998,[2] "federal courts have been generally unsympathetic toward those attempting to assert the privilege." 23 C. Wright & K. Graham, Federal Practice & Procedure § 5427, at 808 (1980 ed.). However, while no privilege "attaches specifically to an accountant/client communication, such matters may be withheld if they meet the traditional requirements of the attorney/client privilege." Mullen & Co., 776 F. Supp. at 621 (quoting Summit Ltd. v. Levy, 111 F.R.D. 40, 41 (S.D.N.Y. 1986)).

_____

[2] As part of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685 (1998), Congress established a limited statutory privilege for accountant-client communications concerning tax advice. See I.R.C. § 7525. The Act, however, covers only communications occurring after July 22, 1998. See id., historical & statutory notes. It therefore has no application in the present case.

To determine whether the attorney-client privilege exists, the First Circuit applies the elements set forth in United States v. Massachusetts Inst. of Tech., 129 F.3d 681 (1st Cir. 1997):

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection may be waived.

Id. at 684 (quoting 8 J. Wigmore, Evidence § 2292, at 554 (McNaughton rev. 1961)). The rationale behind the attorney-client privilege is straightforward: "by safeguarding communications between lawyer and client, [the privilege] encourages disclosures by client to lawyer that better enable the client to conform his conduct to the requirements of the law and to present legitimate claims or defenses when litigation arises." Id. (citing Upjohn Co. v. United States, 449 U.S. 383, 389-90 (1981)). Although the attorney-client privilege is well established, it is narrowly construed because any expansion of the privilege hinders the Court in its search for truth. See id. at 684-85.

Some courts have been willing to extend this privilege to certain accountant communications, recognizing that "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others." United States v. Kovel, 296 F.2d 918, 921 (2d Cir.

1961).   In _Kovel_, which both parties recognize as the leading
case, an accountant who was employed by a law firm refused to
answer questions before a grand jury investigating federal income
tax violations by the law firm's client.  _See_ _id._ at 919.
Analogizing the accountant's role to that of an interpreter who
performs "a menial or ministerial responsibility" to translate
communications for an attorney, the Second Circuit held that the
attorney-client privilege was not destroyed by the presence of an
accountant who is "necessary, or at least highly useful, for the
effective consultation between the client and the lawyer."  _Id._
at 921-22.  "[T]he presence of an accountant, whether hired by
the lawyer or by the client, while the client is relating a
complicated tax story to the lawyer, ought not destroy the
privilege, any more than would that of the linguist ...."  _Id._ at
922.  _Kovel_ limits the privilege to situations where "the
communication [is] made in confidence _for the purpose of_
_obtaining legal advice from the lawyer_."  _Id._ (emphasis added).
"If what is sought is not legal advice but only accounting
service ..., or if the advice sought is the accountant's rather
than the lawyer's, no privilege exists."  _Id._

   _Kovel_ requires that either the Cavallaros, Knight, or Hale
and Dorr hired Ernst & Young for the purpose of facilitating a
legal communication with Hale and Dorr. _See_ 3 J. Weinstein & M.
Berger, _Weinstein's Federal Evidence_ § 503.12[4][b], at 503-31-32

(2d ed. 2000) ("the attorney-client privilege protects a client and his or her accountant or the accountant and the client's attorney when the accountant's role is to clarify communications between attorney and client. Thus, for example, communications with an accountant may be privileged if the accountant was hired by the attorney to assist in understanding the client's financial information."); Edna S. Epstein, The Attorney-Client Privilege and the Work Product Doctrine ("Epstein") 149 (4th ed. 2001) (pointing out that attorney-client protection has been "extended to encompass certain communications made to accountants if the purpose be that they were directly conveyed to an attorney to seek the attorney's advice").

### B.   The Role of Ernst & Young

Because a privilege should be narrowly construed, courts have declined to make expansive interpretations the rule announced in Kovel.  See, e.g., United States v. Ackert, 169 F.3d 136, 138-40 (2d Cir. 1999) (holding that the fact that an attorney confers with an accountant or investment banker to obtain information to better advise a client does not give rise to the greatly enhanced privilege); United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995) (holding that party claiming Kovel-type privilege failed to sustain its burden); In re Grand Jury Proceedings Under Seal, 947 F.2d 1188, 1191 (4th Cir. 1991) (holding that when client used accountant to explain facts to

attorney, lawyer-client privilege protected only communications made at meeting with attorney and those immediately prior to the meeting -- earlier communications between client and accountant were outside the scope of the lawyer-client privilege).  Mullen & Co., 776 F. Supp. at 622 (finding defendant failed to provide adequate record to support application of attorney-client privilege to an accountant's communications).

To establish that a privilege attaches to each of the twenty-eight documents under Kovel rubric, the Cavallaros must show: (1) Ernst & Young was an agent of Hale and Dorr, Knight or the Cavallaros; (2) Ernst & Young's role was to facilitate the Cavallaros' communications to Hale and Dorr made for the purpose of seeking legal advice; (3) the communications were intended to be confidential; and (4) any established privilege was not waived.[3]  See Kovel, 296 F.2d at 921-22.  Here there is no evidence that Hale and Dorr hired Ernst & Young; nor is there evidence that the Cavallaros or Knight hired Ernst & Young to assist them in seeking legal advice from Hale and Dorr.  Rather, the undisputed evidence is that Ernst & Young was paid by, and worked solely for, Camelot and its shareholders.  The engagement letter between Camelot and Ernst and Young specifically states

_____

[3] As it appears that the Cavallaros have abandoned their work-product claim, I address only petitioner's attorney-client privilege claim. Similarly, the Court need not address the government's arguments regarding the crime-fraud exception, as the case can be resolved on other grounds.

-12-

that: "All advice and other service [Ernst & Young] provide[s] pursuant to this engagement are solely for the benefit of Camelot Systems, Inc. and are not for the benefit of anyone other than the corporation or its shareholders." (IRS Ex. J.)  The services for which Ernst & Young was engaged included "Review of Corporate Structure and Recommendations" and "Transfer Planning". (Id.)

The petitioners argue that the Court should disregard the clear language of this agreement because "it might not reflect exactly the complete understanding of the parties" and because, "it would it be surprising if ... [the] letter continued to reflect the evolving understanding of the parties as events unfolded." (Petitioners' Resp. at 8.)  However, this engagement letter was signed only one month before December 19th meeting. The Cavallaros have not produced any contemporaneous documentation to suggest that, as of December 19, 1994, Ernst & Young's professional relationship with the Cavallaro parents changed in a way that would trigger a privilege. See Adlman, 68 F.3d at 1500 ("There is virtually no contemporaneous documentation supporting the view that [the accountant], in this task alone, was working under a different arrangement from that which governed the rest of its work for [the party claiming the privilege].").  While Ernst & Young did apparently provide some tax advice to the Cavallaros, there is no evidence that the accountant was acting as an agent of the Cavallaros or their

-13-

lawyers to assist in securing *legal* advice. See id. at 1499-500

("if the advice sought is the accountant's rather than the

lawyer's, no privilege exists.") (quoting Kovel, 296 F.2d at

922).

In addition, while a principal can loan an agent to another,

see Restatement (Second) of Agency § 227 (1957), the record here

does not support such a shared agency. Accordingly, this case

does not fit into the Kovel paradigm, and I decline to extend the

strictly construed privilege to communications with Ernst & Young

at issue.

### C.   The "common-interest" doctrine

A closer question arises under the "common-interest"

doctrine which the Cavallaros also invoke in an attempt to

salvage their claims of privilege. While the First Circuit has

not outlined the parameters of the common-interest doctrine, it

discussed the animating principle as follows:

> Even where the cases are limited to those involving a
> deliberate and voluntary disclosure of a privileged
> communication to someone other than the attorney or
> client, the case law is far from settled. But decisions
> do tend to mark out, although not with perfect
> consistency, a small circle of "others" with whom
> information may be shared without loss of the privilege
> (e.g., secretaries, interpreters, counsel for a
> cooperating co-defendant, a parent present when a child
> consults a lawyer).
>
> Although the decisions often describe such situations as
> ones in which the client "intended" the disclosure to
> remain confidential, see, e.g., Kevlik v. Goldstein, 724
> F.2d 844, 849 (1st Cir. 1984), the underlying concern is
> functional: that the lawyer be able to consult with

others needed in the representation and that the client
be allowed to bring closely related persons who are
appropriate, even if not vital, to a consultation. <u>Cf</u>.
<u>Westinghouse Elec. Corp. v. Republic of the Philippines</u>,
951 F.2d 1414, 1424 (3d Cir. 1991).   An intent to
maintain confidentiality is ordinarily necessary to
continued protection, but it is not sufficient.

On the contrary, where the client chooses to share
communications outside this magic circle, the courts have
usually refused to extend the privilege.   The familiar
platitude is that the privilege is narrowly confined
because it hinders the courts in the search for truth.
<u>See</u> <u>Fisher v. United States</u>, 425 U.S. 391, 403 (1976); 8
<u>Wigmore</u>, <u>supra</u>, § 2291, at 554.   Fairness is also a
concern where a client is permitted to choose to disclose
materials to one outsider while withholding them from
another. <u>See</u>, <u>e.g.</u>, <u>Permian Corp. v. United States</u>, 665
F.2d 1214, 1221 (D.C. Cir. 1981).

<u>Massachusetts Inst. of Tech.</u>, 129 F.3d at 684-85 (footnotes

omitted).

The Restatement (Third) of the Law Governing Lawyers (2000)

("Restatement") states the doctrine as follows:

If two or more clients with a common interest in a
litigated or nonlitigated matter are represented by
separate lawyers and they agree to exchange information
concerning the matter, a communication of any such client
. . . that relates to the matter [of common interest] is
privileged as against third persons. Any such client may
invoke the privilege, unless it has been waived by the
client who made the communication.

Restatement § 76(1).   A prime example of this occurs, "where [a]

conflict of interest disqualifies a lawyer from representing two

co-defendants in a criminal case, the separate lawyers

representing them may exchange confidential communications to

prepare their defense without loss of the privilege." <u>Id.</u> § 76,

cmt. a (citation omitted).   The touchstone here is that the

-15-

communication must refer to a matter of common interest.  See In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 922-23 (8th Cir.), cert. denied, 521 U.S. 1105 (1997).  With these principles in mind, I address the three categories of documents at issue.

The first group of documents pertains to the notes of December 19, 1994 meeting which addressed transfer tax issues. Arguing that joint conferences are privileged when all the parties to the conference have a common legal interest, the Cavallaros contend that they have a common interest with their children in minimizing the estate taxes.  Because both Camelot and Knight are subchapter S corporations, the Cavallaros assert that there is an identity of interest between shareholders of the small, privately held family business corporation itself, and that Knight (owned by the parents) and Camelot (owned by the children) share a common interest.

I agree that there is a common interest between parents and children in seeking legal advice about estate planning and related transferee gift tax issues, which is not defeated by the presence of the children's accountant who is present to facilitate communications among lawyers.  The government argues that Camelot, the corporation, its comptroller, and its accountant do not have a common legal interest with the Cavallaros in their individual capacities trying to decrease their tax liability.  The Cavallaros respond that each person's

-16-

interests are substantially the same as the corporate interests because the corporations are subchapter S corporations.[4]  This is a factor to be considered, and it makes the question closer. However, "[t]he term 'common interest' typically entails an identical (or nearly identical) legal interest as opposed to a merely similar interest."  FDIC v. Ogden Corp., 202 F.3d 454, 461 (1st Cir. 2000).  Under such a strict definition, the Cavallaros must prove that the subchapter S corporation Camelot and its senior accountant/comptroller have a nearly identical legal interest with the parents as individuals in planning their estate and minimizing their personal taxes.  Whether they have done so is debatable and doubtful.

Even if there were a sufficient commonality of interest, the only party to the meeting who was represented by counsel appears to have been the Cavallaro parents (and possibly Knight, the corporation owned by them).  At no point have the petitioners asserted that *all* parties involved were *jointly* represented in the matter by Hale and Dorr.  Cf. id. ("[W]hen a lawyer represents multiple clients having a common interest, communications between the lawyer and any one (or more) of the

---

[4] A corporation organized under subchapter S of the Internal Revenue Code, I.R.C. §§ 1361-79, enjoys the limited liability of a corporation and "pass-through" tax treatment similar to that accorded to partnerships. See Gitlitz v. C.I.R., 531 U.S. 206, 209 (2001).  Subchapter S status is reserved for small business corporations, i.e., corporations with fewer than 75 shareholders. See I.R.C. § 1361(b)(1)

clients are privileged as to outsiders but not _inter sese_.");
Restatement § 75(1) ("If two or more persons are jointly
represented by the same lawyer in a matter, a communication of
either co-client ... is privileged as against third persons").
In addition, there is no evidence that Camelot or the sons sought
or obtained legal advice from Hale and Dorr.  Cf. _In re Regents
of University of California_, 101 F.3d 1386, 1390 (Fed. Cir. 1996)
(finding that the requisite common interest attached while one
party was not the client of the lawyer but received legal advice
from the attorney), _cert. denied_, 520 U.S. 1193 (1997).  Under
the strict confines of the common-interest doctrine, the lack of
representation for the remaining parties vitiates any claim to a
privilege.  _See_ Restatement § 76(1) ("If two or more clients with
a common interest in a ... matter _are represented by separate
lawyers_ ... a communication of any such client ... that relates
to the matter is privileged as against third persons.") (emphasis
added); _id._, cmt. d ("A person who is not represented by a lawyer
and who is not himself or herself a lawyer cannot participate in
a common-interest arrangement"); 2 _Weinstein's Fed. Evid._ §
503.21[2], at 503-68 ("The [common-interest] privilege applies to
communications made _by the client or client's lawyer to a lawyer
representing another in a matter of common interest._") (emphasis
added and quotations omitted).  The notes and documents relating
to the meeting must therefore be produced.  Likewise, there is no

-18-

basis for asserting a privilege over the second group of documents, the follow-up communications arising from the December 19th meeting.

As for the third category, the merger documents, the Cavallaros urge the Court to adopt a broad view of the common-interest doctrine, claiming that both companies shared a common legal interest in ensuring that the merger was appropriately evaluated and completed. See, e.g., Hewlett-Packard Co. v. Bausch & Lomb, Inc., 115 F.R.D. 308, 310 (N.D. Cal. 1987) (recognizing that the attorney-client privilege extends to a potential purchaser despite disclosure of a lawyer's opinion letter discussing possible violation of a patent since it has same legal interest as target company in evaluating patent issue).

In opposition, the government insists that the common-interest doctrine is limited to parties and their counsel, and therefore, cannot apply to an accounting firm's communications. Cf. United States v. United Tech. Corp., 979 F. Supp. 108, 110 (D. Conn. 1997) (recognizing privilege for a consortium of businesses sharing legal counsel). Morever, the government asserts that the Cavallaros have failed to show a common *legal* interest, as opposed to a mere business interest, for which the documents were created. See Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995)

(holding that common-interest privilege requires not merely a common commercial interest, but a common *legal* interest); <u>Walsh v. Northrop Grumman Corp.</u>, 165 F.R.D. 16, 18-19 (E.D.N.Y. 1996) (same); <u>Libbey Glass, Inc. v. Oneida Ltd.</u>, 197 F.R.D. 342, 349 (N.D. Ohio 1997) (same). <u>See also</u> Epstein, <u>supra</u>, at 204 ("Under the <u>Bank Brussels</u> approach, communications shared during a business undertaking lose their privileged status, even though such sharing helped address or ameliorate bona fide concerns about the legal implications of some aspect of the business venture.").

As for the government's latter argument, the "interest" required by the common-interest doctrine need not be construed so narrowly as to exclude communications involving a common legal interest even where no litigation is on the horizon.  <u>See</u> Restatement § 76(1) (extending privilege to "clients with a common interest in a litigated or non-litigated matter"); <u>id.</u> §76, cmt. e (common interest "may be either legal, factual, or strategic in nature").  The weight of the case law suggests that, as a general matter, privileged information disclosed during a merger between two unaffiliated businesses would fall within the common-interest doctrine. <u>See</u> <u>Hewlett-Packard Co.</u>, 115 F.R.D. at 311 (noting that "courts should not create procedural doctrine that restricts communication between buyers and sellers, erects barriers to business deals, and increases the risk that

-20-

prospective buyers will not have access to important information that could play key roles in assessing the value of the business or product they are considering buying."). See also United States v. Gulf Oil Co., 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985) (holding that common-interest doctrine privileges communications between potential merger partners); Rayman v. Am. Charter Fed. Sav. & Loan Ass'n, 148 F.R.D. 647, 655 (D. Neb. 1993) (same); 8 Fed. Prac. & Proc. § 2016.2, at 250-51. The finding of a common interest is further reinforced where, as is the case here, the merger involves two affiliated S corporations that are owned by members of the same family.

Nonetheless, because only one party to this purported common-interest arrangement was represented by counsel, there is no valid claim of privilege under the common-interest doctrine. See Bank Brussels, 160 F.R.D. at 447 ("[T]he doctrine applies where parties are represented by separate counsel but engage in a common legal enterprise."). See also Restatement § 76(1); id. § 76, cmt. d; 2 Weinstein's Fed. Evid. § 503.21[2], at 503-68. While Ernst & Young may have provided advice to the Cavallaro parents, petitioners cite no evidence to support the claim that the communications with the accountant were intended to facilitate communications with a shared counsel. The petitioners therefore must produce the accountant communications concerning the merger.

-21-

## IV.  ORDER

For the foregoing reasons it is hereby ORDERED that

Petitioners' Motion to Quash Summons (Docket No. 1) is **DENIED** and

the United States' Motion For Denial of Petition to Quash and For

Enforcement of Summons (Docket No. 15) is **ALLOWED** in its

entirety.


PATTI B. SARIS
United States District Judge

Date: 7/27/01

-22-